UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                     :

SCOTT LOMBARDO,                          :
                     Plaintiff,   :

                                     :
           -v-                           :   07 Civ. 8674 (DLC)
                                     :
HOWARD HOLANCHOCK, Dr. CHANDRASEKHARA,   :   OPINION & ORDER
FRANK BRUSINSKI, Dr. SHEYAS BAXI, Dr.    :
SADORRA, LYNBURGH BURTON, ZELMA          :
ARMSTRONG, JOHN DOE,                     :
                    Defendants.   :
                                     :
----------------------------------------X

Appearances:

Pro se Plaintiff:
Scott Lombardo
Mid-Hudson Psychiatric Center
Box 158
New Hampton, New York 10958

For Defendants:
Joshua Pepper
Assistant Attorney General
Office of the Attorney General of the State of New York
120 Broadway
New York, New York 10271

DENISE COTE, District Judge:

    Pro se plaintiff Scott Lombardo brings this action pursuant
to 42 U.S.C. § 1983, alleging violations of his constitutional
rights by staff members at the Mid-Hudson Psychiatric Center
("Mid-Hudson"), to which Lombardo was civilly committed and
where he currently resides.  Defendants have moved to dismiss,
claiming principally that Lombardo has failed to allege any

violation of his constitutionally protected rights.  For the following reasons, defendants' motion is granted in part.

BACKGROUND

The following facts are drawn from the complaint and are assumed to be true, as they must be on a motion to dismiss.[1] Lombardo is a patient-resident at "Mid-Hudson," a secure New York State facility that provides comprehensive evaluation, treatment, and rehabilitation, pursuant to court order, for offenders who have been found not guilty by reason of mental defect or incompetent to stand trial.[2]  He was civilly committed to Mid-Hudson after he pleaded insanity "for a crime that he committed."[3]

On August 15, 2006, Lombardo attended a Gold Card Bingo game, which is restricted to patients with "Gold Card" status.

---

[1]     Certain facts are also drawn from an "Addendum to Complaint," which the plaintiff did not file but did serve on the defendants.  The Court became aware of this Addendum through references in defendants' motion to dismiss.  Defendants provided the Court with a copy of the Addendum, which includes additional factual allegations as well as the twelfth cause of action.  The Addendum has been docketed and filed by order of this Court.  This Opinion treats the complaint and the Addendum together as the pleading to which the defendants' motion is addressed.

[2]     This description of Mid-Hudson is not disputed.  It is not contained in the complaint, but rather is drawn from the webpage of the New York State Office of Mental Health.  See http://www.omh.state.ny.us/omhweb/facilities/ mhpc/facility.htm.

[3]     This fact is drawn from Lombardo's opposition to defendants' motion to dismiss.

He sat next to patient Rebecca B.  About an hour into the game,
Rebecca B. "announced that she was going to the bathroom" and
did not return.  Later that evening, Lombardo was informed by
defendant Dr. Sadorra that Rebecca B. claimed Lombardo "rubbed
her leg and made obscene comments to her such as[] he wanted to
have sex with her."

The following day, Lombardo met with his treatment team,
which included defendants Dr. Sheyas Baxi and Dr.
Chandrasekhara, to discuss Rebecca B.'s allegations.  Lombardo
denied any wrongdoing.  His treatment team suspended his Gold
Card status and prohibited him from attending co-ed activities
pending an investigation.  On August 17, Lombardo was
interviewed by a member of the institution's risk management
team, to whom he provided a list of witnesses to testify on his
behalf concerning Rebecca B.'s allegations.

On August 18, Lombardo was prohibited from attending Jewish
services by Baxi, who explained that the services were co-ed and
therefore off limits to Lombardo.  Later that afternoon,
Lombardo met with members of the Mental Hygiene Legal Services
team, who told him that they would work on gaining him access to
Jewish services.  His Gold Card status was restored on October
31, but the restrictions on his attendance at co-ed activities
remained in place.  On November 22, Lombardo's treatment team

informed him that he would slowly be phased back into co-ed activities. That day, he was permitted to attend a pizza party.

On December 7, Lombardo attended a Behavior Change Group, facilitated by defendant Zelma Armstrong. At that meeting, Lombardo spoke of recent problems he was having with his girlfriend. He also revealed that his girlfriend had been bringing him caffeinated coffee, which is contraband at Mid-Hudson. Armstrong told Lombardo that she was required to report his admission to the treatment team.

The following day, Lombardo's treatment team, including defendant Frank Brusinski, informed Lombardo that his girlfriend would no longer be permitted to visit him because she had "introduced contraband to the facility." The team also searched Lombardo's room and found $34.10 in change. Six dollars of this was placed in Lombardo's personal account; the remainder was placed into the patients' general fund.

On December 26, a box of Christmas cookies was delivered to Lombardo's ward. Throughout the morning, Lombardo observed Mid-Hudson staff members eating the cookies. Believing that the cookies were reserved for patients only, Lombardo reported the staff members' behavior to two members of the ward's staff. At 10 p.m. that evening, Lombardo was awakened by Mid-Hudson staff who informed him that his room was to be searched because the staff had received information that Lombardo was in possession

of contraband matches.  This search -- or "shake down" -- was approved by Sadorra and supervised by defendant Lynburgh Burton. During the search, which lasted forty-five minutes, Mid-Hudson staff recovered sugar packets, ziplock bags, shoe laces, and two sexually provocative pictures.  No matches were recovered.  The following day, Lombardo met with his treatment team.  He was placed on inappropriate sexual behavior alert by Baxi, which resulted in his segregation from the general population for approximately one week.

Lombardo was again required to meet with his treatment team on January 25, 2007, after he sent a birthday card to a female patient.  Baxi informed Lombardo that he was not permitted to communicate with any female patients, except during religious services.  Lombardo asked Baxi whether she "wanted him to be a homosexual."  As a result, he was given an "X," which resulted in four weeks' additional suspension of his Gold Card status.

Lombardo regained his Gold Card status on March 2.  On March 9, his treatment team informed him that he had been accused by a patient of pinching his buttocks in the shower.  As a result, Lombardo was transferred to a different ward, where he was assigned a new treatment team.  Only three days after his transfer, the new treatment team informed Lombardo that "there [we]re already rumors that plaintiff made passes at patients in

the shower room." Accordingly, Sadorra restricted Lombardo to solitary showers.

On or before March 16, Lombardo attempted to send $600 in paper money through the mail. Paper money is contraband in the hospital, and it is unclear how Lombardo acquired it. Lombardo wrapped the money in a manila envelope and sealed it, and then gave the envelope to the ward social worker, along with money to pay the cost of postage. On March 16, Lombardo was told by a Mid-Hudson staff member that the envelope had been opened. The staff member did not provide any details, however, as to who had opened the envelope or why. It was only later, on August 7, 2007, that Lombardo learned that social worker Mildred Smith had opened the envelope. Chandrasekhara later informed Lombardo that he was to be placed on "mail restriction," meaning that all of his outgoing mail -- including his legal mail -- would be observed as it was being placed into the envelope. Three days later, Chandrasekhara informed Lombardo that he had also been placed on "phone restriction," meaning that all of his outgoing telephone calls -- including his legal calls -- would be monitored from his end. Lombardo objected, contending that certain calls should be excluded from surveillance by Mid-Hudson staff because they were "legal calls." He produced a list of such calls and provided it to his treatment team, which approved only part of the list. The team excluded calls to obviously

6

non-legal telephone numbers, such as the New York State Office
of Mental Health.  The team also honored a request from Mental
Hygiene Legal Services not to scrutinize any of Lombardo's legal
mail upon receipt.

Lombardo met with his treatment team on April 12.  Dr.
Phelan, the chief of Lombardo's unit, informed Lombardo that he
would be taken off telephone restrictions if he divulged the
source of the $600 found in his outgoing mail.  The complaint
provides no account of Lombardo's response to Phelan's request.
Nonetheless, Lombardo was taken off telephone restrictions on
April 24.  He remained on mail restrictions.

On May 1, Lombardo's treatment team told him that the $600
discovered in his outgoing mail would be credited in its
entirety to his account if he divulged a legitimate source of
the money.  If he could not provide a legitimate explanation,
the money would be placed into the patients' general fund.  It
is not clear from the complaint whether Lombardo ever proffered
an explanation to the treatment team.  Nonetheless, by letter
dated June 6, defendant Howard Holanchok informed Lombardo that
only ten dollars of the confiscated money had been credited to
his account, with the remainder placed in the patients' fund.

Lombardo was observed playing cards with another patient on
June 29.  Believing that the two patients were gambling, a Mid-
Hudson staff member summoned Brusinski, who approved a pat-frisk

7

of Lombardo and a search of his quarters.  When Lombardo returned to the ward that night, his quarters were searched upon Brusinski's orders.  Twenty-five dollars in coins were confiscated from Lombardo's quarters.

Lombardo filed the complaint in this action on October 9, 2007, bringing eleven causes of action under 42 U.S.C. § 1983 for alleged violations of his constitutional rights and his rights under the New York State Mental Hygiene Law.  A twelfth was added through the Addendum.  Defendants moved to dismiss on January 25, 2008, arguing primarily that Lombardo failed to state a violation of his constitutional rights or any law of the United States.  Further, they contended that they were immune from this action based on absolute or qualified immunity. Lombardo opposed the motion on March 4; defendants submitted their reply on March 28.

DISCUSSION

When considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted).  At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss."  Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d

328, 337 (2d Cir. 2006) (citation omitted).  A court must apply
a "flexible plausibility standard, which obliges a pleader to
amplify a claim with some factual allegations in those contexts
where such amplification is needed to render the claim
plausible."  Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007)
(citation omitted).  "To survive dismissal, the plaintiff must
provide the grounds upon which his claim rests through factual
allegations sufficient to raise a right to relief above the
speculative level."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,
493 F.3d 87, 98 (2d Cir. 2007).  Nonetheless, a pro se pleading
must be more liberally construed.  "A document filed pro se is
to be liberally construed and a pro se complaint, however
inartfully pleaded, must be held to less stringent standards
than formal pleadings drafted by lawyers."  Boykin v. KeyCorp,
521 F.3d 202, 214 (2d Cir. 2008) (citation omitted).

    In their motion to dismiss, defendants helpfully analyze
Lombardo's twelve causes of action according to the
constitutional provisions and state law upon which they are
based.  The following analysis will proceed in the same fashion.

I.   The Due Process Clause

    Lombardo alleges the following violations of the Due
Process Clause: (1) Baxi, Chandrasekhara, and Brusinski violated
the Due Process Clause by restricting Lombardo's access to
religious services, segregating him from the ward population,

and prohibiting him from writing to female patients, based on allegations by a female patient and without interviewing Lombardo himself (First Cause of Action); (2) Armstrong violated Lombardo's "right to confidentiality" by reporting to her supervisors that Lombardo's girlfriend had brought him contraband caffeinated coffee (Fifth Cause of Action); (3) Brusinski unconstitutionally deprived Lombardo of the money that was found during searches of his quarters by depositing that money into the patients' general fund, rather than Lombardo's personal account (Seventh Cause of Action); (4) Holanchok unconstitutionally attempted to "coerce" Lombardo when he offered to end Lombardo's mail restrictions if he provided the source of the $600 confiscated from his outgoing mail (Tenth Cause of Action); and (5) Holanchok unconstitutionally deprived Lombardo of the money confiscated from his outgoing mail when he placed the $590 into the patients' general fund (Eleventh Cause of Action).

"In evaluating due process claims, the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." Perry v. McDonald, 280 F.3d 159, 173 (2d Cir. 2001) (citation omitted). The Supreme Court has recognized that patients involuntarily committed to state mental institutions enjoy a constitutionally protected liberty interest in safe conditions and freedom from bodily restraint.

Youngberg v. Romeo, 457 U.S. 307, 315-16 (1982).  The plaintiff
in Romeo was violent, and was shackled while treated in the
infirmary for a broken arm.  Id. at 310.  The Court held that
such committed inmates also have a constitutionally protected
liberty interest in "minimally adequate or reasonable training"
to ensure safety and freedom from undue bodily restraint.  Id.
at 319.

In assessing whether rights under the Due Process Clause
have been violated, a court weighs "the individual's interest in
liberty against the State's asserted reasons for restraining
individual liberty."  Id. at 320.  Any decision regarding a
restraint on these liberty interests that is made by a
professional "is presumptively valid."  Id. at 323.  To prevail
on a due process claim, a plaintiff must show that the
professional's decision "is such a substantial departure from
accepted professional judgment, practice, or standards as to
demonstrate that the person responsible actually did not base
the decision on such a judgment."  Id.

When a person is deprived of a liberty or property interest
protected by the Constitution, the state must provide notice and
an opportunity to be heard.  Mathews v. Eldridge, 424 U.S. 319,
348 (1976).  "The precise form of notice and hearing depends
upon balancing (1) the state's interest; (2) the private
interest affected by the state's action; and (3) the risk of

11

erroneous deprivation and the value of additional safeguards." Perry, 280 F.3d at 174. "[T]he existence of an adequate state remedy to redress property damage inflicted by state officials avoids the conclusion that there has been any constitutional deprivation of property without due process of law within the meaning of the Fourteenth Amendment." Parratt v. Taylor, 451 U.S. 527, 542 (1981) (citation omitted), overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327, 330-31 (1986); see Doe v. Dep't of Public Safety ex rel. Lee, 271 F.3d 38, 55 (2d Cir. 2001) (citation omitted), rev'd on other grounds, Conn. Dep't of Public Safety v. Doe, 538 U.S. 1 (2003).

With the exception of his assertion that his money was seized, Lombardo's due process claims do not recite a deprivation of a constitutionally protected interest. Specifically, the restrictions on his participation in prison activities and correspondence with female patients, the reporting of his violations of the institution's rules, and the requests that he divulge the source of contraband currency do not constitute interference with constitutionally protected interests.

Lombardo complains of three seizures of money. On December 8, 2006, $28.10 of $34.10 found in his room was placed into the patients' general fund. On March 16, 2007, $590 of $600 was

12

also placed in that fund.[4]  Finally, on June 29, 2007, $25 in coins was seized from his room.  These allegations describe a deprivation of property by officers acting under color of state law.  See Parratt, 527 U.S. at 536-37.  Nonetheless, Lombardo's claim for recovery of these moneys is a simple tort claim.  As the Second Circuit has observed, "[t]he Supreme Court has been emphatic that not every tort committed by public officers is actionable under the Constitution, even though every one could be thought to deprive the tort's victim of an interest in the nature of liberty or property."  Dep't of Public Safety ex rel. Lee, 271 F.3d at 55.

Lombardo has an adequate state remedy for the seizures of his money because he can bring an action for conversion of his property.  See Parratt, 451 U.S. at 543-44; Hudson v. Palmer, 468 U.S. 517, 530, 533 (1984).  The New York Court of Claims Act provides Lombardo with a cause of action against the State for this tort.  See N.Y. Ct. of Claims Act § 9; see Brown v. State, 674 N.E.2d 1129, 1133-34 (N.Y. 1996).  Accordingly, he has failed to state a claim under § 1983 for violation of his rights under the Due Process Clause.

---

[4]    As Lombardo's complaint acknowledges, the $600 in paper money was contraband, and in Lombardo's possession in violation of the institution's rules.

II.  First Amendment Right to Religious Freedom

Lombardo claims that Baxi, Chandrasekhara, and Brusinski violated his First Amendment right to freedom of religion by prohibiting him from attending religious services (Third Cause of Action).  In his complaint, and in the cause of action concerning religious freedom, Lombardo mentions only one Jewish service he was unable to attend.[5]  In opposition to this motion, Lombardo adds that in lieu of attending the service he asked to see a rabbi but that the rabbi never came.

In the Second Circuit, to prevail on a free exercise claim, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs."  Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir. 2006) (citation omitted).[6]  The First Amendment protects inmates' free exercise rights "even when the infringement results from

---

[5]    An appendix attached to his complaint, however, lists four services -- one Jewish, two Protestant, and one for "Spiritual Development" -- that Lombardo was allegedly prohibited from attending.  To prevail on a free exercise claim, the plaintiff must "demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious."  Fifth Ave. Presbyterian Church v. City of New York, 293 F.3d 570, 574 (2d Cir. 2002) (citation omitted).  As a consequence, the complaint will be construed as asserting that the plaintiff is Jewish and that the defendants interfered with his practice of his Jewish faith.

[6]    No party has suggested that the analysis for a free exercise claim by an involuntarily committed individual is different from the analysis applied to prisoners' free exercise claims.  Accordingly, the free exercise analysis applied in the prison context will apply here.

the imposition of legitimate disciplinary measures." McEachin
v. McGuinnis, 357 F.3d 197, 204 (2d Cir. 2004); see also Young
v. Coughlin, 866 F.2d 567, 570 (2d Cir. 1989) (observing that
"prisoners should be afforded every reasonable opportunity to
attend religious services, whenever possible").  Thus,
defendants must "justify their restriction of [plaintiff's] free
exercise rights" by reference to legitimate penological
interests.  McEachin, 357 F.3d at 204 (citation omitted).

     Lombardo has pleaded a violation of his First Amendment
rights with his allegation that Baxi prohibited him from
attending Jewish services on August 18, 2006.  Defendants also
claim that defendants are entitled to qualified immunity on
Lombardo's free exercise claim because they "could not
reasonably have thought that barring Plaintiff from a single
service could constitute an infringement of his Free Exercise
right."

     Under the doctrine of qualified immunity, a government
official may be shielded from liability "if his conduct did not
violate clearly established rights or if it would have been
objectively reasonable for the official to believe his conduct
did not violate plaintiff's rights." Reuland v. Hynes, 460 F.3d
409, 419 (2d Cir. 2006) (citation omitted).  In determining
whether a defendant is entitled to qualified immunity, the
relevant inquiry is whether the right that was allegedly

violated was "clearly established at the time of the defendant's behavior." Saucier v. Katz, 533 U.S. 194, 201 (2001). "The essence of the principle is that officers sued in a civil action for damages under 42 U.S.C. § 1983 have the same right to fair notice as do defendants charged with a criminal offense." Pena v. DePrisco, 432 F.3d 98, 115 (2d Cir. 2005) (citation omitted). In assessing a qualified immunity claim, a court must consider:

> (1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

Id. (citation omitted).

The right of an incarcerated person to observe his religion and to attend congregate religious services was well-established in this Circuit before August 2006. See Salahuddin v. Coughlin, 993 F.2d 306, 308 (2d Cir. 1993); Young, 866 F.2d at 570.[7] It was also well-established as of that time that the right is not

---

[7] Defendants rely on an unpublished Second Circuit summary order, dated March 29, 2004, for their contention that they "could not reasonably have thought that barring Plaintiff from a single service could constitute an infringement of his Free Exercise right." Pursuant to the rules of the Second Circuit, citation to unpublished summary orders filed before January 1, 2007 is not permitted. 2d Cir. R. 32.1. Regardless of what the order says, a summary, unpublished disposition cannot articulate the law of the Circuit with the clarity requisite for a qualified immunity defense.

abrogated when the incarcerated person is subject to disciplinary constraints, see McEachin, 357 F.3d at 204, but that restrictions may be imposed when they are "reasonably related to legitimate penological interests," Young, 866 F.2d at 570.

The defendants are entitled to qualified immunity on Lombardo's free exercise claim. Relying solely on the allegations in the complaint and construing those allegations in the light most favorable to the plaintiff, it was objectively reasonable for the defendants to believe that the restriction on Lombardo's participation in a single co-ed religious service was reasonably related to legitimate penological interests. The service occurred just three days after Rebecca B. complained that Lombardo had touched her and had made obscene comments to her, and during that time Lombardo's treatment team was investigating those allegations. The claim based on the asserted violation of the Free Exercise Clause is dismissed. See Young v. Goord, No. 01 Civ. 0626 (JG), 2005 WL 562756 (E.D.N.Y. Mar. 10, 2005), aff'd, 192 Fed. App'x 31, 33 (2d Cir. 2006).

III. Illegal Searches and Seizures

Lombardo contends in his Sixth and Twelfth Causes of Action that defendants Sadorra, Burton, and Brusinski violated his right to be free from searches and seizures "for harassment

purposes" when they ordered or supervised searches of his quarters.[8]  Lombardo was told that the search at issue in the Sixth Cause of Action was performed because "some unnamed person said that Plaintiff was in possession of matches," but suggests that the search was in retaliation for his complaints that staff members were eating the patients' Christmas cookies.  As noted above, the search yielded no matches, but other contraband was discovered.  As to the search at issue in the Twelfth Cause of Action, Lombardo observes that it was effected after a pat-frisk, conducted because of suspicions he was gambling, revealed no contraband on his person.

As the defendants rightly observe, the Second Circuit has not articulated the level of privacy enjoyed by a civilly committed psychiatric patient such as Lombardo.  But see Buthy v. Commissioner of Office of Mental Health of New York State, 818 F.2d 1046, 1051 (2d Cir. 1987) (applying the levels of protection afforded pre-trial detainees under the Due Process Clause to persons confined due to an acquittal by reason of insanity or due to their incompetence to stand trial). Youngberg v. Romeo teaches that "[p]ersons who have been involuntarily committed are entitled to more considerate

---

[8]    Lombardo's Twelfth Cause of Action alleges that Brusinski violated Lombardo's rights "by approving 'shake-down' on Plaintiff after he was pat-frisked, with no contraband found." This cause of action thus challenges the "shake-down" search of Lombardo's quarters, and not the pat-frisk that preceded it.

treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Romeo, 457 U.S. at 321-22. "At the same time, this standard is lower than the compelling or substantial necessity tests the Court of Appeals would require a State to meet to justify use of restraints or conditions of less than absolute safety." Id. at 322. Moreover, Romeo makes clear that courts must defer to the considered judgment of professionals in institutions to which persons are involuntarily committed. Id. at 323.

In the convicted prisoner and pretrial detainee contexts, the Supreme Court has permitted searches of inmates' cells, finding that such a search gives rise to neither a Fourth Amendment nor Fourteenth Amendment claim. See Block v. Rutherford, 468 U.S. 576, 590 (1984); Hudson, 468 U.S. 517 at 530. The Supreme Court observed that "it would be literally impossible to accomplish the prison objectives" of preventing the introduction of contraband and illicit weapons, detecting escape plots, and maintaining a sanitary environment "if inmates retained a right of privacy in their cells." Hudson, 468 U.S. at 527; see Willis v. Artuz, 301 F.3d 65, 69 (2d Cir. 2002).[9]

---

[9]    A pretrial detainee may retain a limited Fourth Amendment right when a search is instigated by non-prison officials acting for non-institutional security reasons. Willis, 301 F.3d at 68. Since Lombardo does not assert that the searches were instituted at the behest of officials outside Mid-Hudson, this limited right need not be discussed further.

The same rationale obtains in the context of an involuntarily committed person.  Romeo makes clear that involuntarily committed persons should be free of "conditions of confinement [that] are designed to punish."  Romeo, 457 U.S. at 322.  The Romeo rule is thus animated by a concern that individuals who have not been convicted of a crime not be punished as criminals.  The Block/Hudson rule, on the other hand, is motivated by concerns about institutional security and health.  The protections accorded to involuntarily detained individuals under Romeo thus do not serve to undermine the Block/Hudson rationale that deprives institutionalized persons of their Fourth Amendment rights.  As the Supreme Court has observed, "[i]t is difficult to see how the detainee's interest in privacy is infringed by the room-search rule.  No one can rationally doubt that room searches represent an appropriate security measure . . . ."  Bell v. Wolfish, 441 U.S. 520, 557 (1979);[10] see also United States v. Willoughby, 860 F.2d 15, 21 (2d Cir. 1988).  Accordingly, as an involuntarily detained person, Lombardo has no Fourth Amendment right against searches of his cell, and thus no claim under § 1983 for the alleged

---

[10]    In Bell, the Supreme Court assumed that a pretrial detainee had a diminished expectation of privacy after commitment to a custodial facility, and found that searches of these detainees' cells did not violate the Fourth Amendment.  Bell, 441 U.S. at 557.

violations of his Fourth Amendment rights.  His claims to this
effect are therefore dismissed.

To the extent Lombardo argues that the first search was
effected in retaliation for his complaint about the staff
members, that claim also fails.  "While . . . the scope of
conduct that can constitute actionable retaliation in the prison
setting is broad, it is not true that every response to a
prisoner's exercise of a constitutional right gives rise to a
retaliation claim."  Dawes v. Walker, 239 F.3d 489, 492-93 (2d
Cir. 2001); see also Davis v. Goord, 320 F.3d 346, 353 (2d Cir.
2003).  The courts of this district are unanimous in holding
that even retaliatory searches of a prisoner's cell do not give
rise to a claim under § 1983.  See Salahuddin v. Mead, 95 Civ.
8581 (MBM), 2002 WL 1968329, at *5 (S.D.N.Y. Aug. 26, 2002)
(collecting cases).  "Cell searches are so fundamental to the
effective administration of persons and to the safety of
prisoners and staff that the searches should not be second-
guessed for motivation."  Id. at *3.  For the reasons discussed
above, involuntarily committed persons have no right to privacy
in their cells.  Accordingly, Lombardo cannot state a
retaliation claim for a search of his cell.

IV.  Right to Contact with Counsel

Read broadly, Lombardo's Ninth Cause of Action alleges that
defendants violated his right "to confidential communications

21

with attorneys" by refusing to allow him private telephone calls and by observing him as he placed his outgoing mail into envelopes.  Lombardo's claim fails to the extent it is brought under the First and Fourteenth Amendments.

As the Second Circuit has observed, "[i]nterference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution."  Davis, 320 F.3d at 351.[11] Presumably the same holds true for legal communication by telephone and for the rights of inmates committed by reason of insanity.  "To state a claim for denial of access to the courts -- in this case due to interference with legal mail -- a plaintiff must allege that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim," id. (citation omitted); for instance, actions that

---

[11]    Lombardo predicates the Ninth Cause of Action in part on the Sixth Amendment, which applies only in criminal cases. Presumably, his Sixth Amendment claim concerns defendants' alleged interference with Lombardo's communication with his attorneys in connection with the underlying criminal case that resulted in his civil commitment.  Defendants' treatment of this claim in their motion papers is cursory.  In his opposition, Lombardo explains that he was committed to Mid-Hudson pursuant to New York Criminal Procedure Law.  Liberally read, this argument suggests that his commitment proceedings and eventual exit proceedings from Mid-Hudson were criminal in nature, and that the Sixth Amendment therefore applies to him.  Lombardo is therefore granted leave to replead his Ninth Cause of Action insofar as it raises a Sixth Amendment claim.

led to the dismissal of an otherwise meritorious legal claim, id.

 This claim fails for a number of reasons. First, Lombardo has failed to allege, as required by Davis, that defendants' actions "resulted in actual injury."[12] He has not alleged any way in which he was affected by defendants' mere observation of him sending mail, or surveilling his outgoing telephone calls. Second, Lombardo has not alleged that defendants searched his mail, only that they observed him placing the mail into envelopes. Observation of the mail, standing alone, cannot impinge on Lombardo's access to counsel, "since the mail would not be read." Wolff v. McDonnell, 418 U.S. 539, 577 (1974). Third, per his request and the request of Mental Hygiene Legal Services, defendants agreed not to scrutinize any mail to Lombardo from the Mental Hygiene Legal Service or to listen to any legal calls.[13] Accordingly, Lombardo's Ninth Cause of Action

---

[12]  If Lombardo's failure to allege that the defendants hindered his pursuit of a meritorious legal claim were the sole deficiency, then Lombardo would be granted leave to replead, since the defendants did not move to dismiss his Ninth Cause of Action on this ground. As it is, the other grounds for dismissal are sufficient to support dismissal.

[13]  In an appendix to his complaint, Lombardo lists thirty-two telephone calls, identifying the staff member "who assisted [Lombardo] in making" the calls and the intended recipient. In his opposition to defendants' motion to dismiss, Lombardo identifies these calls for the first time as "legal telephone communications [that] were listened to on 32 occasions by members of Plaintiff's treatment team." Nowhere in his

fails to the extent it is predicated on the First and Fourteenth Amendments.

V.    Eighth Amendment

In his Second Cause of Action, Lombardo alleges that defendants Baxi, Chandrasekhara, and Brusinski violated his Eighth Amendment right to be free from cruel and unusual punishment by preventing him from attending certain activities, segregating him from other patients, preventing written communication with female patients, and denying him visits from his girlfriend.  Further, in his Tenth Cause of Action, Lombardo claims that defendant Holanchok violated his Eighth Amendment rights by "attempting to coerce him," when he offered to end Lombardo's mail restrictions if Lombardo identified the source of the $600 confiscated from his outgoing mail.  These claims fail as Eighth Amendment claims because that constitutional amendment does not apply to one who has been civilly committed. By its terms, the Eighth Amendment applies only to "punishment,"

---

complaint does Lombardo allege that the staff members "listened to" these calls; he only claims that they "assisted [him] in making" them.  Further, the calls were made to the Mental Health In-House Complaint Line, the Commission on Quality Care, the Joint Commission of Accreditors of Health Care Organizations, Mental Hygiene Legal Services, and a handful of unidentified individuals.  Only Mental Hygiene Legal Services is identified as a legal services provider, and defendants agreed not to listen to any calls from this organization.  Lombardo does not dispute this fact.  Accordingly, the appendix does not support any plausible claim that Lombardo's counsel-related rights were violated by the defendants.

and as "an insanity acquittee . . . was not convicted, he may not be punished." Jones v. United States, 463 U.S. 354, 369 (1983); see also Youngberg, 457 U.S. at 324-25.

Reading the complaint liberally, Lombardo's Second and Tenth Causes of Action fail to state any constitutional claims. For the most part, the injuries of which Lombardo complains have either been discussed and rejected in the preceding discussion or do not implicate any right protected by the Constitution. Only one claim requires further discussion: Lombardo asserts that he was denied visits from his girlfriend. This could be construed as raising a First Amendment claim. Assuming arguendo that Lombardo possessed a First Amendment right to freedom of association with his girlfriend, his claim fails. Lombardo acknowledges that his girlfriend brought him contraband caffeine, and that the restrictions on his visits with her were introduced as a result of these infractions. Lombardo does not argue that these restrictions were unreasonable, or that there was any impermissible reason for defendants' restrictions on his visits with his girlfriend. Further, Lombardo was permitted to receive other visitors, and to communicate with his girlfriend through other means, such as mail. See Smith v. Coughlin, 748 F.2d 783, 788 (2d Cir. 1984).

25

VI.   State Law Claims

    Lombardo alleges two violations of the New York Mental

Hygiene Law.  First, in his Fourth Cause of Action, he claims

that Baxi, Chandrasekhara, and Brusinski violated his rights

under the New York Mental Hygiene Law by denying him access to

religious services.  Second, the Eighth Cause of Action seeks to

hold defendant "John Doe" liable for violating Lombardo's rights

under 14 N.Y.C.R.R. § 527.11, which prescribes guidelines

governing mental health patients' free communication with others

within and outside the facility to which they are committed.  In

his "Addendum to Complaint," Lombardo identifies "John Doe" as

Mildred Smith, a Mid-Hudson social worker.  These claims fails.

"The Mental Hygiene Law is a regulatory statute."  McWilliams v.

Catholic Diocese of Rochester, 536 N.Y.S.2d 285, 286 (4th Dep't

1988).  "No private cause of action is authorized for violations

of the Mental Hygiene Law."  Id.[14]

CONCLUSION

    The Court has considered Lombardo's other arguments and

finds them to be without merit.  Defendants' January 25, 2008

motion to dismiss is granted in part.  Lombardo is granted leave

---

[14]   Lombardo is surely aware of this principle.  In a previous
lawsuit, his claims under the New York Mental Hygiene Law were
dismissed on the same basis.  See Lombardo v. Stone, No. 99 Civ.
4603 (SAS), 2001 WL 940559, at *5 (S.D.N.Y. Aug. 20, 2001).

to replead his Ninth Cause of Action under the Sixth Amendment.

A scheduling order accompanies this Opinion.

SO ORDERED:

Dated:    New York, New York
          June 25, 2008


                                    DENISE COTE
                              United States District Judge

Copies sent to:


Scott Lombardo
Mid-Hudson Psychiatric Center
Box 158
New Hampton, NY 10958

Joshua Pepper
Assistant Attorney General
Office of the Attorney General of
the State of New York
120 Broadway
New York, NY 10271